## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JIM FARES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 12-1381-SLR |
| | ) |
| PETER LANKAU, et al., | ) |
| | ) |
| Defendants. | ) |

---

Seth D. Rigrodsky, Esquire, Brian D. Long, Esquire, and Gina M. Serra, Esquire of Rigrodsky & Long, P.A, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Patrick W. Powers, Esquire and Peyton J. Healey, Esquire of Powers Taylor LLP.

Dominick T. Gattuso, Esquire of Proctor Heyman LLP, Wilmington, Delaware. Counsel for Defendants. Of Counsel: Jonathan K. Cooperman, Esquire and Nicole M. Hudak, Esquire of Kelley Drye & Warren LLP.

---

**MEMORANDUM OPINION**

Dated: June 19, 2013
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff Jim Fares ("Fares") alleges that Peter Lankau, Douglas Karp, Eric Liebler, William Maichle, Neil Milano, Geoffrey Raker, Frank Sica, Zubeen Shroff, David Azad, John Groom, Galen Partners V, L.P., Galen Partners International V, L.P., Tailwind Capital Partners LP, Tailwind Holdings (Cayman), L.P., Tailwind Management, L.P., Tailwind Capital Partners (AI), L.P., Tailwind Capital Partners (PP), L.P., Tailwind Capital Partners (ERISA), L.P., and Nautilus Neurosciences, Inc. ("Nautilus") (collectively, "defendants") wrongfully diluted the value of Nautilus and, therefore, either breached their fiduciary duty to him or aided and abetted a breach of fiduciary duty.  (D.I. 12 at 1) Fares demands a jury trial and requests damages from defendants.  (*Id.* at ¶ 70, Prayer for Relief at ¶¶ 1-6)

Currently before the court is defendants' motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(3), 12(b)(6), and 23.1.  (D.I. 16)[1]  The court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2).

## II. BACKGROUND

Fares founded Nautilus and was responsible for identifying, negotiating, and acquiring the flagship product of the company, "Cambia," a migraine medication.  (D.I. 12 at ¶ 26)  Fares invested $750,000 into Nautilus and has been a shareholder continuously throughout the relevant time period.  (*Id.* at ¶ 27)  Cambia was a successful venture, achieving a sales run rate of $12 million between spring 2010 and spring 2011.  (*Id.* at ¶ 29)  Fares then left Nautilus in April 2011 but remained a shareholder.  (*Id.* at ¶ 30)  In 2010, while still an employee, Fares was issued his shares of stock at $1,000 per share

---

[1]Given plaintiff's amended complaint, defendants' original motion to dismiss is denied as moot.  (D.I. 6)

and, upon termination, Tailwind Investor,[2] the controlling shareholder, offered Fares a 10% premium over his purchase price, amounting to $1,100 per share. (*Id.* at ¶ 36)

Fares alleges that after his departure, Tailwind Investor continued to cause Nautilus to issue shares in order to dilute the value of Fares' shares. (*Id.* at ¶ 32) To this end, on May 9, 2012, defendants allegedly caused Nautilus to issue a "Notice of Proposed Issuance of Notes" (the "May 9 notice"). (*Id.* at ¶ 33) On May 11, 2012 defendants caused Nautilus to issue a "Notice of Proposed Issuance of Series C Preferred Stock" (the "May 11 notice"), which superceded the May 9 notice. (*Id.* at ¶ 34) The Series C Convertible Stock was offered at par value $0.01 per share, at a price of $345 per share. (*Id.* at ¶ 34)

Fares maintains that the offering price in the May 11 notice was unjustifiably low relative to the value of Nautilus. (*Id.* at ¶ 36) To support his assertion that the company has been devalued, Fares cites a valuation of the company made in 2011 based on sales run rate or yearly sales and states that Nautilus is expected to have a run rate of between $23 and $25 million. (*Id.* at ¶¶ 38-39) In contrast, when Fares was issued his previous shares, the run rate was only $12 million, yet Fares paid a higher purchase price of $1,000 than the $345 purchase price offered in the May 11 notice. (*Id.* at ¶ 38)

After Fares received the notices, he sent a letter through counsel on June 4, 2012 to defendant Maichle, CEO of Nautilus, objecting to the proposed issuance because it would dilute the interests of minority shareholders. (*Id.* at ¶ 41) On June 13, 2012, Fares sent another letter requesting access to Nautilus' books and records. (*Id.*) His

---

[2]Fares refers to Tailwind Capital Partners LP, Tailwind Holdings (Cayman), L.P., Tailwind Management, L.P., Tailwind Capital Partners (AI), L.P., Tailwind Capital Partners (PP), L.P., and Tailwind Capital Partners (ERISA), L.P. collectively as "Tailwind Investor." (D.I. 12 at ¶ 21)

requests were denied. (*Id.* at ¶ 42) Nautilus, by way of defendant Milano, Chief
Financial Officer, Secretary and Treasurer, sent out a July 20 "Notice to Minority
Stockholders of Nautilus Neurosciences, Inc.," which explained the amendment of the
certificate of incorporation to reflect the addition of the new class of shares. (*Id.* at ¶ 43)

Defendants contend that the dilution of Fares' equity was due to his refusal to buy
his proportionate share of the Series C Preferred Stock rather than defendants' actions.
(D.I. 17 at 1) Furthermore, they make several arguments for the dismissal of Fares'
claims. First, his claims should be dismissed because they are plainly derivative and
Fares failed, under Rule 23.1, to make a demand on Nautilus' board of directors or claim
demand futility before filing this lawsuit. (*Id.* at 9-12) Second, defendants aver that,
pursuant to the Stockholders Agreement, Fares can only bring suit in New York courts
and waived the right to a jury trial, thereby seeking dismissal pursuant to Rules 12(b)(3)
and 12(b)(6). (*Id.* at 12-14) Defendants also allege that Fares released all claims
against them in his Separation Agreement and Release, which would allow dismissal
pursuant to Rule 12(b)(6). (*Id.* at 14-15) Finally, defendants claim that Fares' breach of
fiduciary duty and aiding and abetting claims both fail to state a claim and are pled
improperly pursuant to Rule 12(b)(6). (*Id.* at 15-20) As the Rule 23.1 grounds for
dismissal are dispositive, the court does not address the Rule 12(b)(3) or 12(b)(6)
grounds.

## III. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 23.1(b)(3), a shareholder bringing a
derivative action must file a verified complaint that "state[s] with particularity:"

3

(A) any effort by the plaintiff to obtain the desired action from the directors
or comparable authority and, if necessary, from the shareholders or
members; and

(B) the reasons for not obtaining the action or not making the effort.

Therefore, Rule 23.1 provides a heightened pleading standard. "Although Rule 23.1

provides the pleading standard for derivative actions in federal court, the substantive

rules for determining whether a plaintiff has satisfied that standard 'are a matter of state

law.'" *King v. Baldino*, 409 F. App'x 535, 2010 WL 5078008 (3d Cir. Dec. 14, 2010)

(citing *Blasband v. Rales*, 971 F.2d 1034, 1047 (3d Cir. 1992)). "Thus, federal courts

hearing shareholders' derivative actions involving state law claims apply the federal

procedural requirement of particularized pleading, but apply state substantive law to

determine whether the facts demonstrate [that] demand would have been futile and can

be excused." *Kantor v. Barella*, 489 F.3d 170, 176 (3d Cir. 2007).

> In this regard, the Delaware Supreme Court has explained that
> the entire question of demand futility is inextricably bound to issues of
> business judgment and the standard of that doctrine's applicability. . . . It is
> a presumption that in making a business decision the directors of a
> corporation acted on an informed basis, in good faith and in the honest
> belief that the action taken was in the best interests of the company.

*Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm*

*v. Eisner*, 746 A.2d 244, 253-54 (Del. 2000). "The key principle upon which this area

of . . . jurisprudence is based is that the directors are entitled to a **presumption** that they

were faithful to their fiduciary duties." *Beam ex. rel. Martha Stewart Living Omnimedia,*

*Inc. v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004). Therefore, the burden is on the party

challenging a board's decision to establish facts rebutting the presumption that the

business judgment rule applies. *Levine v. Smith*, 591 A.2d 194, 205-06 (Del. 1991).

By promoting the exhaustion of intracorporate remedies as an alternate dispute

resolution over immediate recourse to litigation, "the demand requirement is a

4

recognition of the fundamental precept that directors manage the business and affairs of corporations." *Aronson*, 473 A.2d at 811-12. With this framework in mind, the Delaware Supreme Court has characterized the exercise of determining demand futility as deciding whether, under the particularized facts alleged, a reasonable doubt is created that (1) "the directors are disinterested and independent," or (2) "the challenged transaction was otherwise the product of a valid exercise of business judgment." *Id.* at 814; *see also Brehm*, 746 A.2d at 256 ("These prongs are in the disjunctive. Therefore, if either prong is satisfied, demand is excused."). "The spirit that clearly animates [this] test is a [c]ourt's unwillingness to set aside the prerogatives of a board of directors unless the derivative plaintiff has shown some reason to doubt that the board will exercise its discretion [in responding to demand] impartially and in good faith." *In re infoUSA, Inc. v. S'holders Litig.*, 953 A.2d 963, 986 (Del. Ch. 2007).

## IV. DISCUSSION

A claim brought by a shareholder against a company and its board of directors can be either direct or derivative. The determination of whether a claim is direct or derivative depends "solely on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of the recovery or other remedy (the corporation or the stockholders, individually)?" *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004). For a claim to be direct, the court must find that the defendants' actions "directly and individually harmed the stockholders, without injuring the corporation." *Id.* at 1038.

Generally, most equity dilution claims are derivative, and not direct, causes of action because the corporation is injured by the dilution of its value and the appropriate remedy, restoring the company's lost value, would repair the corporation rather than individual shareholders. *See Tooley*, 845 A.2d at 1033. Fares, however, claims that his breach of fiduciary duty claim against defendants is direct by relying on a narrow exception in equity dilution cases. (D.I. 12 at ¶ 57)

Equity dilution claims may be both direct and derivative in the limited circumstances when "(1) a stockholder having majority or effective control causes the corporation to issue 'excessive' shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders." *Gentile v. Rossette*, 906 A.2d 91, 98 (Del. 2006). The derivative claim is the injury to the corporation due to the overpayment of shares to the controlling stockholder, the value of which the corporation may recover. *Id.* at 100. If the *Gentile* standard is satisfied, public or minority stockholders would have a separate, direct claim as well, arising out of the misappropriation of economic value and voting power. *Id.*

Here Fares' complaint merely asserts, almost verbatim, the standard from *Gentile*:

Tailwind Investor, a stockholder having majority or effective control, has caused the corporation to issue excessive shares of its stock in exchange for assets of the controlling stockholder that have lesser value, and the exchange caused an increase in the percentage of the outstanding shares owned by the controlling stockholder and a corresponding decrease in the share percentage owned by the minority shareholders.

(D.I. 12 at ¶ 57)  Fares' complaint does not mention any "exchange for assets" that are of lesser value than the stocks issued. *See Gentile*, 906 A.2d at 98 (showing that both prongs of the test require the exchange of excessive shares for assets of the controlling

stockholder that are of lesser value).  Fares' claim has components of a direct claim in that he individually suffered economic injury and a decrease in voting power; however, without the requisite exchange the *Gentile* standard has not been met.  As such, Fares' claim is derivative and not direct.

Since Fares' claim is derivative, Fares was required to either first make a demand on Nautilus' board before commencing suit or otherwise claim that making such a demand would be futile.  Fed. R. Civ. P. 23.1(b)(3).  Fares does not assert that he made a demand, but instead argues that demand would be futile.

Under the first prong of *Aronson*, demand is excused when a plaintiff pleads particularized facts that raise a reasonable doubt that a director is disinterested or independent. *See Aronson*, 473 A.2d at 814-15.  There are two ways a director can be deemed "interested" in a transaction.  First, "[a] director is interested if he will be materially affected, either to his benefit or detriment, by a decision of the board, in a manner not shared by the corporation and the stockholders." *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995); *see also Orman v. Cullman*, 794 A.2d 5, 25 n.50 (Del. Ch. 2002).  The second occurs where "a director stands on both sides of the challenged transaction;" this latter way of showing interestedness does not require allegations of materiality. *Orman*, 794 A.2d at 25 n.50.  "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson*, 473 A.2d at 816.  A director's

7

independence may be challenged by "allegations that raise a reasonable inference that a given director is dominated through a 'close personal or familial relationship or through force of will,' or is so beholden to an interested director that his or her 'discretion would be sterilized.'" *In re infoUSA, Inc.*, 953 A.2d at 985 (quoting *Orman*, 794 A.2d at 25 n.50).

Fares' complaint alleges that "defendants have breached [their] duties by ignoring or failing to protect against the numerous conflicts of interest resulting from their dual status." (D.I. 12 at ¶ 53) This allegation falls short of the heightened standard for particularized pleading for demand futility and does not even specify which defendants breached these duties. There are no other allegations regarding director disinterestedness or lack of independence. Fares alleges conflicts of interest without any factual particularity, which does not create a reasonable doubt as to the independence or disinterestedness of the directors. *See Aronson*, 473 A.2d at 814.

The second prong of *Aronson* examines whether a plaintiff's particularized allegations raise a reasonable doubt that the challenged transaction was a product of valid business judgment. *Id.* Defendants' business decisions are generally presumed valid. *Beam*, 845 A.2d at 1048. When the first prong is not met, the burden to meet the second prong's threshold is particularly high. *Id.* Fares alleges that "[defendants] acted in gross disregard of the facts, or failed to exercise due care to prevent the unlawful and improper conduct described herein." (D.I. 12 at ¶ 59) This allegation also fails to meet the heightened pleading standard of Rule 23.1. Fares offers no additional details to support his claims that may raise a reasonable doubt and, therefore, neither *Aronson* prong for finding demand futility is satisfied.

## V. CONCLUSION

For the foregoing reasons, the court grants defendants' motion to dismiss under

Rule 23.1. An appropriate order shall issue.