IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JIM FARES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 12-1381-SLR |
| | ) |
| PETER LANKAU, et al., | ) |
| | ) |
| Defendants. | ) |

Seth D. Rigrodsky, Esquire, Brian D. Long, Esquire, and Gina M. Serra, Esquire of Rigrodsky & Long, P.Al, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Patrick W. Powers, Esquire, and Peyton J. Healey, Esquire of Powers Taylor LLP.

Dominick T. Gattuso, Esquire of Proctor Heyman LLP, Wilmington, Delaware. Counsel for Defendants. Of Counsel: Jonathan K. Cooperman, Esquire, and Nicole M. Hudak, Esquire of Kelley Drye & Warren LLP.

**MEMORANDUM OPINION**

Dated: August 15, 2013
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Fares, a shareholder of Nautilus Neurosciences, Inc. ("Nautilus"), filed this action on November 2, 2012 against Peter Lankau ("Lankau"), Douglas Karp ("Karp"), Eric Liebler ("Liebler"), William Maichle ("Maichle"), Neil Milano ("Milano"), Geoffrey Raker ("Raker"), Frank Sica ("Sica"), Zubeen Shroff ("Shroff"), David Azad ("Azad"), John Groom ("Groom"), Galen Partners V, L.P., Galen Partners International V, L..P., Tailwind Capital Partners LP, Tailwind Holdings (Cayman), L.P., Tailwind Management, L.P., Tailwind Capital Partners (AI), L.P., Tailwind Capital Partners (PP), L.P., and Tailwind Capital Partners (ERISA), L.P. (collectively, "defendants").[1] (D.I. 1) In his amended complaint, filed January 14, 2013, Fares alleges that defendants breached their fiduciary duty and/or aided and abetted a breach of fiduciary duty by wrongfully diluting the value of Nautilus and failing to issue adequate disclosure. (D.I. 12)

On June 19, 2013, the court issued a memorandum opinion and order granting defendants' motion to dismiss the amended complaint. (D.I. 28; D.I. 29) Currently before the court is Fares' motion for reconsideration under Federal Rule of Civil Procedure 60(b). (D.I. 30) The court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2).

## II. BACKGROUND

### A. Fares' Complaint

Fares founded Nautilus and was responsible for identifying, negotiating, and acquiring the flagship product of the company, "Cambia," a migraine medication. (D.I.

---

[1] The court will refer to Galen Partners V, L.P. and Galen Partners International V, L.P. collectively as "Galen Partners." The court will refer to Tailwind Capital Partners L.P., Tailwind Holdings (Cayman), L.P.,, Tailwind Management, L.P., Tailwind Capital Partners (AI), L.P., Tailwind Capital Partners (PP), L.P., and Tailwind Capital Partners (ERISA), L.P. collectively as "Tailwind."

12 at ¶ 26)  He invested $750,000 in Nautilus and has been a shareholder continuously throughout the relevant time period.  (*Id.* at ¶ 27)  Cambia was a successful venture, achieving a sales run rate of $12 million between spring 2010 and spring 2011.  (*Id.* at ¶ 29)  In April 2011, Fares left Nautilus but remained a shareholder.  (*Id.* at ¶ 30)  In 2010, while still an employee, Fares was issued his shares of stock at $1,000 per share and, upon termination, Tailwind Investor[2] offered Fares a 10% premium over his purchase price, or $1,100 per share.  (*Id.* at ¶ 36)

Fares alleges that, after his departure, Tailwind Investor and Galen Partners acted in concert to cause Nautilus to issue shares with the goal of increasing their ownership while simultaneously diluting the ownership of minority shareholders.  (*Id.* at ¶ 32)  To this end, on May 9, 2012, defendants allegedly caused Nautilus to issue a "Notice of Proposed Issuance of Notes" (the "May 9 notice").  (*Id.* at ¶ 33)  On May 11, 2012, defendants caused Nautilus to issue a "Notice of Proposed Issuance of Series C Preferred Stock" (the "May 11 notice"), which superceded the May 9 notice.  (*Id.* at ¶ 34)  The Series C Convertible Stock was offered at par value $0.01 per share, at a price of $345 per share.  (*Id.* at ¶ 34)

Fares maintains that the offering price in the May 11 notice was unjustifiably low relative to the value of Nautilus.  (*Id.* at ¶ 36)  To support his assertion that the company was devalued, Fares cites a valuation of the company made in 2011 based on the sales run rate or yearly sales and contends that Nautilus was expected to have a run rate of between $23 and $25 million.  (*Id.* at ¶¶ 38-39)  In contrast, when Fares was issued his

---

[2]Fares refers to Tailwind Capital Partners LP, Tailwind Holdings (Cayman), L.P., Tailwind Management, L.P., Tailwind Capital Partners (AI), L.P., Tailwind Capital Partners (PP), L.P., and Tailwind Capital Partners (ERISA), L.P. collectively as "Tailwind Investor."  (D.I. 12 at ¶ 21)

2

previous shares, the run rate was $12 million, yet Fares paid a higher purchase price of $1,000 than the $345 purchase price offered in the May 11 notice. (*Id.* at ¶ 38)

After Fares received the notices, he sent a letter through counsel on June 4, 2012 to defendant Maichle, CEO of Nautilus, objecting to the proposed issuance because it would dilute the interests of minority shareholders. (*Id.* at ¶ 41) On June 13, 2012, Fares sent another letter requesting access to Nautilus' books and records. (*Id.*) His requests were denied. (*Id.* at ¶ 42) Nautilus, by way of defendant Milano, Chief Financial Officer, Secretary and Treasurer, sent out a July 20 "Notice to Minority Stockholders of Nautilus Neurosciences, Inc.," which explained the amendment of the certificate of incorporation to reflect the addition of the new class of shares. (*Id.* at ¶ 43)

### B. Procedural History

On February 6, 2013, defendants filed a motion to dismiss Fares' amended complaint on various grounds. (D.I. 16) The court granted defendants' motion on June 19, 2013. (D.I. 28; D.I. 29) Fares then filed the motion for reconsideration currently before the court, as well as a notice of appeal. (D.I. 30; D.I. 31) On July 24, 2013, the Third Circuit issued an order staying the appeal pending this court's decision on the motion for reconsideration. (D.I. 34)

In granting defendants' motion to dismiss, the court observed that, although equity dilution claims are traditionally derivative, they may be both direct and derivative when "(1) a stockholder having majority or effective control causes the corporation to issue 'excessive' shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders." *Gentile v. Rossette*, 906 A.2d 91, 98 (Del. 2006). Under the *Gentile*

1

framework, the court held that Fares' equity dilution claim was a derivative, not a direct, cause of action. (D.I. 28 at 6-7) Specifically, Fares failed to adequately plead an exchange of excessive shares for assets of the controlling stockholder that are of lesser value; rather, the assertion that his cause of action met the standard for a direct dilution claim was made by way of legal conclusions. (*See id.*)

The court then analyzed Fares' cause of action as a derivative claim and found that it did not pass muster under the heightened standard of Federal Rule of Civil Procedure 23.1 for pleading demand futility. (*Id.* at 7-8) The court did not reach the other grounds for dismissal raised by defendants, that: (1) under the stockholders agreement, Fares can only bring suit in New York court and waived the right to a jury trial; (2) Fares released all claims against defendants in his separation agreement and release; and (3) Fares' breach of fiduciary duty and abetting claims fail to state a claim under Federal Rule of Civil Procedure 12(b)(6). (*Id.* at 3)

## III. STANDARD OF REVIEW

Motions for reconsideration are the "functional equivalent" of motions to alter or amend judgment under Federal Rule of Civil Procedure 59(e). *See Jones v. Pittsburgh Nat'l Corp.*, 899 F.2d 1350, 1352 (3d Cir. 1990) (citing *Fed. Kemper Ins. Co. v. Rauscher*, 807 F.2d 345, 348 (3d Cir. 1986)). The standard for obtaining relief under Rule 59(e) is difficult to meet. The purpose of a motion for reconsideration is to "correct manifest errors of law or fact or to present newly discovered evidence." *Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). A court should exercise its discretion to alter or amend its judgment only if the movant demonstrates one of the following: (1) a change in the controlling law; (2) a need to

2

correct a clear error of law or fact or to prevent manifest injustice; or (3) availability of new evidence not available when the judgment was granted. See id.

## IV. DISCUSSION

Fares' motion for reconsideration is premised on a recent Chancery Court case that is allegedly inconsistent with this court's decision. Carsanaro v. Bloodhound Technologies, Inc., 65 A.3d 618 (Del. Ch. 2013), was decided by the Delaware Court of Chancery on March 15, 2013, after Fares had filed his answering brief for the motion to dismiss (D.I. 22) but before defendants filed their reply brief (D.I. 25).

The Court of Chancery in Carsanaro was faced with a suit brought by individual plaintiffs against board members of Bloodhound Technologies, Inc. ("Bloodhound"). The plaintiffs, who had helped found Bloodhound, alleged that venture capitalists took control of the board and approved self-interested and highly dilutive stock issuances that left the plaintiffs with, collectively, less than 1% ownership of Bloodhound. Carsanaro, 65 A.3d at 628. After a merger, the individual plaintiffs no longer had standing to bring a derivative shareholder suit. On a motion to dismiss, the Court of Chancery found that plaintiffs had stated a direct claim for "wrongful expropriation" under the Gentile framework. The court held that "[s]tanding will exist if a controlling stockholder stood on both sides of the transaction. Standing will also exist if the board that effectuated the transaction lacked a disinterested and independent majority." Id. at 658. Because the various venture capital investors allegedly constituted a "control group," the court concluded that the complaint pleaded a direct claim.

Fares asserts that Carsanaro stands for the proposition that the "exchange of assets of lesser value" element of a direct dilution claim may be met by pleading that an exchange of cash took place that was insufficiently low relative to the purchased stock.

3

(D.I. 30 at 6-7) In his initial response to defendants' motion to dismiss argument that "[n]owhere does the Amended Complaint state which assets were allegedly 'exchanged' or identify any alleged exchanged assets that were worth 'lesser value'" (D.I. 17 at 11), Fares neither pointed to cash as the asset of lesser value nor cited any case law for such an argument. Rather, Fares conclusively argued:

> Plaintiff has alleged [the first element of a direct dilution claim] through the exchange for assets of the controlling stockholder that have a lesser value, alleging that Tailwind Investor "has caused the corporation to issue excessive shares of its stock in exchange for assets of the controlling stockholder that have lesser value."

(D.I. 22 at 14)

"[I]ntervening developments in the law by themselves rarely constitute the extraordinary circumstances required for relief under Rule 60(b)(6)." *Reform Party v. Allegheny Cnty. Dep't of Elections*, 174 F.3d 305, 311 (3d Cir. 1999) (quotation marks omitted); *see also Budget Blinds, Inc. v. White*, 536 F.3d 244, 255 (3d Cir.2008) (footnote omitted); *Coltec Indus., Inc. v. Hobgood*, 280 F.3d 262, 273 (3d Cir. 2003). Here, however, the court finds that *Carsanaro* clarified the first requirement of *Gentile* such that the court's prior decision is arguably inconsistent with Delaware law.

In *Carsanaro*, the Court of Chancery noted that it "ha[d] struggled with how to interpret *Gentile*" and proceeded to clarify when an equity dilution claim may be a direct cause of action. *Carsanaro*, 65 A.3d at 657-61. With respect to the exchange of assets requirement, the court held that "[t]he complaint alleges that . . . Bloodhound issued shares carrying significantly greater rights than the value of the **cash** the corporation received, thereby increasing the ownership and control of the [controlling stockholders] at the expense of the common stockholders." *Id.* at 659 (emphasis added). In other

words, the over-issuance of shares for cash of lesser value is an exchange for assets of the controlling stockholder that have a lesser value.

Defendants argue that the facts of *Carsanaro* are distinguishable because the *Carsanaro* court required an exchange for cash of shares with "significantly greater rights." (D.I. 32 at 3) Defendants point out that the Series E financing at issue in *Carsanaro* carried more favorable conversion rights than other shares. (*Id.*) (citing *Carsanaro*, 65 A.3d at 631-32) However, defendants ignore that the Series D and follow-on Series E financing that were also at issue did not carry such a liquidation preference – they were simply exchanged for monetary payment. The *Carsanaro* court's finding that such exchanges met the "exchange of assets" element of *Gentile* was driven by the observation that a dilutive stock issuance at an unfair price harms both the company (because it receives too little compensation) and stockholders (because their proportional rights to vote and receive dividends are reduced). There was no additional requirement that the shares being exchanged had to carry more favorable rights than other shares. Rather, the court found that the **over-issuance** of shares to the controlling stockholder for an insufficient payment constitutes "an improper transfer – or expropriation - of economic value and voting power from the public shareholders to the majority or controlling stockholder." *Carsanaro*, 65 A.3d at 656-67.

Previous cases in which dilution claims were found to be direct under *Gentile* had never analyzed whether a cash exchange for shares, i.e., a sale of stock, could satisfy the "exchange for assets" element. *See, e.g.*, *Gentile*, 906 A.3d at 93 (considering a case in which the controlling shareholder caused the corporation to issue him an excessive number of shares in exchange for forgiveness of an outstanding debt); *Rhodes v. Silkroad Equity*, Civ. No. 2133, 2007 WL 2058736, at *3, *5 (Del. Ch. July 11,

5

2007) (analyzing a case in which a controlling shareholder forced minority shareholders to agree to a deal whereby it received $3 of preferred shares for every dollar borrowed by the company and also loaded the company with employees and misappropriated the company's funds). The only case that found an equity dilution claim to be direct where there was a cash exchange for shares was an unpublished opinion in which the "exchange for assets" element was not discussed. *See Dubroff v. Wren Holdings, LLC*, Civ. No. 3940, 2011 WL 5137175, at *2-3, *7-8 (Del. Ch. Oct. 28, 2011). Therefore, the court agrees with Fares that *Carsanaro* clarifies that a cash exchange for shares at a price that the well-pled facts indicate is too low can satisfy the "exchange of assets" requirement of *Gentile*.

Here, Fares's amended complaint contains allegations that the challenged stock issuance was underpriced at $345 per share. He alleges that "the offering price of $345 [was] unjustifiably low and [did] not reflect the proper value of [Nautilus]. Notably in 2010, Fares was issued his shares at $1,000 per share. And when his employment terminated in April 2011, Tailwind Investor offered Fares a 10% premium over his purchase price – $1,100 per share." (D.I. 12 at ¶ 36; *see also id.* at ¶ 44) He also asserts that the issuance for inadequate consideration "made [his] investment less valuable" and "caused an increase in the percentage of the outstanding shares owned by the controlling stockholder and a corresponding decrease in the share percentage owned by the minority shareholders." (*Id.* at ¶¶ 56-57) Fares' allegations, taken as true at this stage of litigation, align with the *Carsanaro* court's finding that an over-issuance of stock for insufficient consideration raises a reasonable inference of an expropriation of both economic value and voting power. Under *Carsanaro*, this excessive issuance of shares allegedly worth more than the cash received in exchange meets *Gentile*'s

6

requirement for the issuance of "'excessive' shares of . . . stock in exchange for assets . . . that have a lesser value."[3] *Gentile*, 906 A.2d at 98.

Having found that Fares has met the "exchange of assets" requirement as clarified by *Carsanaro*, the court moves on to the rest of the *Gentile* analysis. *Carsanaro* also clarified that, under the first requirement of *Gentile*, a "controlling stockholder" for purposes of *Gentile* exists if the board that effectuated the transaction lacked a disinterested and independent majority, not just a significant quantity of common stock. *Carsanaro*, 65 A.3d at 659-60. The *Carsanaro* court found that plaintiffs had adequately alleged, under Rule 12(b)(6) standards, that three out of six defendant directors were not independent due to their competing fiduciary role for a third party entity and, thus (with a fourth interested director), formed a control group for purposes of *Gentile*. *Id.* at 638, 659. Fares has pled similar allegations in his complaint, namely that five of Nautilus's nine directors – Karp, Raker, Sica, Shroff, and Azad – had a conflict of interest by owing fiduciary duties to both Nautilus and either Tailwind Investor or Galen Partners. (D.I. 12 at ¶¶ 3, 7-10, 48, 50) Although the court's motion to dismiss decision found that Fares had failed to raise a reasonable doubt under the heightened standard of Rule 23.1 that a majority of the directors were

---

[3]The court notes that, unlike many cases that have been held to be direct dilution claims, Fares does not plead facts regarding the percentage by which the controlling stockholder's ownership increased relative to the percentage by which the minority shareholders' ownership decreased. *See, e.g.*, *Carsanaro*, 65 A.3d at 630, 634 (noting that the plaintiffs' interest decreased from 9% prior to the challenged dilutive transactions to less than 1%); *Gentile*, 906 A.3d at 95 (noting that the controlling shareholder's equity holding in the company increased from 61.19% to 93.49%, whereas the minority shareholders' holding reduced from 38.81% to 6.51%); *Dubroff*, 2011 WL 5137175, at *3 (noting that the control group's holdings increased from approximately 56% to approximately 90%). Although Fares' complaint passes muster at this stage, it does not indicate that Fares will necessarily prevail on the merits.

disinterested and independent, the court finds that he has pled a reasonable inference that a majority of directors were interested or lacked independence under Rule 12(b)(6).

The second requirement for a direct dilution claim is that the exchange causes an increase in the share percentage ownership of the controlling stockholder and a corresponding decrease in the share percentage ownership of the minority shareholders. *Gentile*, 906 A.2d at 98. Defendants contend that Fares' complaint fails to meet this second prong because Fares was given an opportunity to buy his proportionate share of the challenged stock issuance. (D.I. 17 at 11) In addition, defendants assert that any change in Fares' percentage ownership was the result of his decision not to participate in the issuance. (*Id.*) Fares does not dispute that he was given notice of the challenged issuance and afforded the opportunity to buy his proportionate share of the new shares. (*See* D.I. 12 at ¶ 35)

The second prong of *Gentile*, however, does not require that the change in percentage ownership be the result of an issuance that barred minority shareholders from participating in the transaction. As the Court of Chancery found in *Dubroff*:

> Although some Delaware courts have used the word 'exclusive,' or its equivalent, in discussing direct equity dilution claims, the syllogism – if anyone other than the controller benefits from the transaction, then the minority may not assert a direct equity dilution claim – is much too simplistic. A corporation's minority shareholders should not be denied a direct equity dilution claim where a controller expropriates, from them, a large percentage of the corporation's equity, keeps most of that expropriated equity for itself, and gives a small amount to other people.

*Dubroff*, 2011 WL 5137175, at *8 (citing *Gentile*, 906 A.2d at 100; *Feldman v. Cutaia*, 956 A.2d 644, 658 (Del. Ch. 2007); *St. Clair Shores Gen. Employees Ret. Sys. v. Eibeler*, 745 F. Supp. 2d 303, 313 n.10 (S.D.N.Y. 2010)) (footnote omitted). The *Carsanaro* court noted that an individual claim is possible when there is an "inter-class conflict" in which the directors favored themselves and shifted value away from the

8

common stock.  *Carsanaro*, 65 A.3d at 660.  Therefore, Fares' allegation that Tailwind Investor and Galen Partners "substantially and correspondingly increased their holdings in Nautilus" at the expense of Fares is sufficient to meet the second prong of *Gentile*.

Fares' complaint meets the framework of *Gentile* for a direct dilution claim, as clarified by *Carsanaro*.  Moreover, he does not seek additional money on behalf of Nautilus from the challenged issuance but, rather, a reallocation of rights at the stockholder level.  Accordingly, his claim is direct.

Because there is a pending appeal in this case, the court declines to consider at this time the other arguments raised in defendants' motion to dismiss.  If the appeal is dismissed, the court will then address the other arguments.

## V. CONCLUSION

For the foregoing reasons, Fares' motion for reconsideration is granted.  An appropriate order shall issue.